*C. BELKNAP and others *against* D. BELKNAP and others.

Under the *act for draining swamps and bog meadows, in the counties of Orange and Dutchess*, passed the 9th of *April*, 1804, (sess. 27. ch. 91.) the *inspectors*, appointed by the Court of Common Pleas, for draining the *great swamp* or bog meadow, near *Newburgh*, must strictly observe the precise limits prescribed by the act; and can only *continue* the *main ditch* dug for that purpose, at the north end of the *great pond*, through lands *adjoining* the swamp: they have no authority to dig down the *outlet*, at the southeast end of the pond, and thereby injure or destroy valuable *mills*, &c. erected on the *outlet*, and on land not adjoining the great swamp, or to break up ancient and useful streams of water, by draining the natural reservoirs which feed them. And if they exceed their power, in this respect, this *Court* will *grant* a *perpetual* injunction to restrain all proceedings touching the *outlet* of the pond, and for *quieting* the plaintiffs in the enjoyment of the water for their mills, &c.

THE plaintiffs are seised of lands in *Newburgh*, adjoining the *east* side and *south* end, and including part of a small lake or pond, called the " *Great Pond*," lying on both sides of the *Passaick creek*, or *outlet* of the pond; and have, on the *outlet*, about 70 rods distant from the pond, a grist-mill and a saw-mill. One of the plaintiffs, *C. B.*, is also seised of a farm of 200 acres, with valuable mills and factories thereon, worth about 20,000 dollars, situate about four and a half miles from the pond, and one and a quarter mile from the *Hudson*, which he holds in trust for the other plaintiffs and himself; and the stream of water from the pond contributes materially to the use of the last-mentioned mills, and gives them their chief value. The level of the pond is about 18 feet above the low lands east of it, and distant about 80 rods, and the average depth of the pond is 13 feet. There is a dam erected across the outlet, for the use of the first-mentioned mills; the water, at the dam, being about six feet, and the fall below about 10 feet. The bill, also, stated, that the *pond* had ˚immemorially served for the use of the mills, &c.; and that a dam and mill had been kept up there for above 20 years past; and that the *outlet*, dam, &c. were improved for the mills below. That the plaintiffs, in 1809, purchased the mills and *dam at the outlet, and made great improvements, chiefly with a view to the mills, &c. situate four and a half miles below. That the pond was one and a half mile long, and one mile broad, and covered about 400 acres; that the *great swamp or bog meadow*, lies *north* of the pond, and the pine swamp *south* of it.

*June 9th.*

[ * 464 ]

1817.
BELKNAP
v.
BELKNAP.

[ *465 ]

That in 1811, the defendants, and others, claiming to be proprietors of part of the *great swamp*, and desirous to have the same ditched and drained under the *act making provision for draining swamps and bog meadows, in the counties of Orange and Dutchess*, passed the 9th of *April*, 1804, (sess. 27. ch. 91. s. 1. 6.) presented a *petition* to the Court of Common Pleas of *Orange* county, pursuant to the directions of the first section of the said act ; that there was an offer to show cause against the application ; but the Court granted the petition, and appointed *five inspectors*, four of whom acted ; and, on the 10th of *September*, 1813, made a *report*, that they had surveyed the *swamp*, and deemed it practicable to drain it, and profitable to the proprietors, and had determined the number of acres of each proprietor to be benefited, and made a *map* (a) of the tract and *the course of the ditches to be cut, and assessed the sums to be paid by each proprietor, and described the course of the ditches requisite to be cut, and kept open ; and they added : " We find it necessary to continue the main ditch through lands adjoining the said tract of swamp or bog meadow, for the purpose of draining the same more effectually, viz. through what is called *the outlet of the great pond*, at the place where the gate is erected, to extend the course the said outlet naturally runs, easterly, about 21 chains, to the low lands or swamp below the pond, to be cut 16 feet wide and 10 feet deep, and that the lands through which this last ditch was to be continued were owned by *C. B.* and others, (the plaintiffs,) and that they could not agree with them as to the damage."

(a) The following diagram, taken from the map exhibited in the cause, will serve to elucidate the facts in the case.

They, therefore, applied to the Court to appoint *appraisers*, pursuant to the sixth section of the act.

The bill further stated, that the main and branch ditches in the *great swamp* to the *north*, and in the *pine swamp* to the *south* of the pond, are calculated and intended to drain the waters thereof into the *great pond*. That those swamps cannot be effectually drained by leading the waters thereof into the great pond; as the pond, from its elevation, is incapable of receiving the waters necessary to be drained off, unless the pond itself is considerably lowered, or, in a great degree, drained and thereby materially to diminish the value of the plaintiffs' mills, &c. That to enlarge the outlet of the great pond, and cut it down, in the manner the inspectors have reported, would prostrate the dam, and, in a great degree, drain the pond; that the inspectors consider such reduction as a *continuation* of the *main ditch,* whereas the *outlet* is at the *southeast* end of the pond, about one mile, on a direct line across the pond, from the place where the *main ditch* strikes the pond, at the *north* end. That the land of the plaintiffs, at the outlet, does *not adjoin* the *great swamp,* though it does adjoin the pine swamp; and the lands of the plaintiffs, at the outlet, *extend into the pond, about 15 chains. That the pond is a never-failing source of water to all the mills below, and that draining the swamp, in the manner proposed, would destroy the benefit of the water to the mills. That, according to the report, the number of acres to be benefited by the draining and ditching, is 1210 acres, and the sum assessed to be raised is 4840 dollars, out of which the damages are to be paid; that the damages of the plaintiffs, by the operation, would be 5000 dollars for the first farm, and 10,000 dollars for the second farm, &c. held by *C. B.* in trust for himself and the other plaintiffs. That the act of the legislature does not warrant any such draining of the pond, nor the cutting any ditch that does not commence on the bog meadow, and be, from necessity, *continued* therefrom through the land adjoining; nor does it authorize touching the dam, &c. at the *outlet*. That the inspectors exceeded their powers under the act; that their *report* was, therefore, null, and ought not to have been confirmed by the Court. That the Court proceeded on the ground, that the report was final and conclusive, and could not be revised by them, and they accordingly appointed three appraisers. That the appraisers are proceeding in the appraisement, and threaten to cut the ditches, &c. The bill prayed, that the proceedings touching the outlet of the pond might be declared null; that the rights of the plaintiffs might be declared, and they be quieted in the enjoyment thereof; that

1817.

BELKNAP
v.
BELKNAP.

[ * 466 ]

the defendants may be enjoined from assessing and ditching, &c., in regard to the outlet, &c., and for general relief.

BELKNAP
v.
BELKNAP.

The answer of the defendants admitted the titles of the plaintiffs, except as to the pond, and that the mills at the outlet depended for water on the *great pond;* but they say that those mills are of little value. They admitted also the title of *C. B.* as *trustee,* &c., but say, that the *lower* mills are not much benefited by the pond, and would be more so, if the dam was lowered, as proposed; and they alleged that there were no mills at the outlet, until within *30 years; and they admitted the proceedings as to draining the bog meadow, &c., as stated in the bill, and allege that those proceedings were regular and pursuant to the act; and that the inspectors did not exceed their powers : they denied that cutting the outlet, as proposed, would drain the pond; but they admitted that it would injure the mills there, but not to the amount of 4,000 dollars, &c.

[ * 467 ]

*S. Jones, jun.,* and *Boyd,* for the plaintiffs.

*Harison,* and *Riggs,* for the defendants.

The counsel for the plaintiffs insisted on the following points : 1. That the proceedings of the defendants were not authorized by the act.

2. That the inspectors exceeded their powers, and their proceedings were irregular and void.

3. That the draining of the bog meadow, in the manner proposed, would greatly injure the lower mills of the plaintiffs, for which damage no compensation was provided.

4. That the operation ought not to be permitted, until adequate compensation was provided.

5. That the defendants ought to be restrained, by injunction, from proceeding, and the plaintiffs be quieted in their rights.

They cited 1 *Ch. Cas.* 504. 1 *Bro. Ch. Cas.* 588. 2 *Vernon,* 390. 1 *Madd. Ch.* 129.

*For the defendants,* the following points were raised :

1. That the draining, &c. according to the plan proposed by the inspectors, will not injure the mills of the plaintiffs, situated farthest from the pond ; and that if the mills, near the pond should be destroyed by the proposed operation of draining, they were of no public importance, and the private injury would be compensated by the funds to be raised from the property benefited.

[ * 468 ]

*2. That the legislature had vested in the Court of Common Pleas, and in the inspectors appointed by that Court, 360

exclusively, the right of determining whether the contemplated works ought to be done, subject only to the superintending power of the Supreme Court to correct errors; and that a Court of equity has no jurisdiction in the case, there being neither fraud nor accident to give it jurisdiction.

3. That this Court has no authority beyond that of a Court of law, in construing and expounding an act of the legislature; and that, with respect to acts like the one for draining the swamps in question, the particular jurisdiction thereby erected acts *conclusively*, while it acts within the bounds prescribed.

They cited 5 *Vesey*, 610. 7 *Vesey*, 3. 10 *Vesey*, 209. 2 *Vernon*, 711. 1 *Ch. Cas.* 227. 3 *Ch. Rep.* 226. 2 *Atk.* 144. 2 *Dow's Rep.* 519. 534.

THE CHANCELLOR. The bill is filed to quiet the plaintiffs in the possession and enjoyment of their mills and other improvements, on the *Passaic* creek or outlet of the *great pond*, near *Newburgh*, and to stop the defendants from lowering the outlet. The proceedings complained of were instituted by the defendants, under the act of the 9th of *April*, 1804, relative to the *draining of swamps and bog meadows in the counties of Orange and Dutchess;* and the principal question in the case is, whether the act gives authority to interfere with the property of the plaintiffs, in the manner proposed.

The design of the act was to enable any one or more of the proprietors of swamps and bog meadows to have them drained, at the joint expense of all the proprietors. Most of the provisions in the act apply, therefore, exclusively to the interest of those proprietors, and do not touch the plaintiffs. When application is made to the Court of Common Pleas to have inspectors appointed to determine on the expediency, the plan, and the expense of draining, and to *make a ratable assessment of the expense, the notice enjoined by the act is to be directed to the parties interested in the lands to be drained. The notice is to " all persons interested therein," that, is, in the swamp or bog meadow. No other persons are called on to take notice of the proceeding, or to have any concern in the appointment. And when the inspectors have made their return, the proprietors may meet and choose commissioners to act in the place and stead of the inspectors, and who are then to be clothed with their powers. There is but one section under which third persons, who are not interested in the lands to be drained, can be affected by these private and *ex parte* proceedings, and here they are affected only in what appears to have been considered as a mere incidental circumstance. The 6th section provides, that in case the inspectors shall find it

1817.

BELKNAP
v.
BELKNAP.

*June* 9th.

[ * 469 ]

1817.

BELKNAP
v.
BELKNAP.

[ * 470 ]

necessary " to continue such ditch or ditches through lands adjoining any such tracts of swamp or bog meadow, for the purposes of draining the same more effectually, they are authorized to agree and settle with the owner or owners of such lands, for such damage as is likely, in their opinion, to be sustained by such owner or ,owners, by reason of such ditch, &c. ; and if they cannot agree, the inspectors are to apply to the Court to appoint appraisers." It is under this section that the present controversy has arisen.

The inspectors have reported a plan for draining the swamps north and south of the great pond, and have, in their map, laid down the course of a main ditch through each swamp, and terminating at the pond. This pond, which is designated on the map as the *great* pond, is a mile and a half long, and one mile broad, and on an average, 13 feet deep, and covers 400 acres of land. The ditches terminating at the pond will not, it seems, answer the purpose of draining the swamps, on account of the elevation of the water ; and the inspectors accordingly propose to lower the pond very materially, by cutting down the outlet of it, *by a ditch 10 feet deep, and 16 feet wide. The plaintiffs allege, and have gone largely into proof to show, that this project of lowering the pond would destroy the value of the pond and outlet, as a source of water for the use of mills below. The defendants admit that the mill and dam at the outlet would be essentially affected ; but they insist, and have gone into proof to show, that the mills of the plaintiffs lower down on the outlet would not be injured. The witnesses differ essentially, in their opinion and judgment on this point. But the question of damage is not the one I am now considering. It is sufficient, for the discussion of the matter of right, that the mill and dam at the outlet must be injured, and that the lowering of the pond to the extent proposed, is an experiment deemed by many very hazardous, in respect to the future value of the outlet to all the mills that are seated upon it. The important question is, Have the defendants authority, under the 6th section of the act, to cut down this outlet? Can this properly be deemed a *continuation* of the main ditch through lands *adjoining* the swamp ? The inspectors, in their report, so consider it ; for they say, " we find it necessary to continue the first-mentioned main ditch through lands adjoining said tract of swamp or bog, for the purpose of draining the same more effectually, viz. through what is called the outlet of the great pond ;" and yet it appears that this outlet is at the distance of one mile from the termination of the main ditch above alluded to.

From the best consideration that I have been able to be-

362

stow on the subject, it appears to me that the inspectors have given too extended a construction to their powers under the act.

To continue a line or ditch, does not, in the ordinary or grammatical sense, admit of any intervening substance to break the continuity. . It implies uninterrupted connection; and the ditch cannot properly be said to be *continued,* by terminating it at the north end of the pond, and \*by deepening the outlet of that pond at the southeast corner. We cannot suppose it without indulging in the same poetical fiction by which the river *Alpheus* was continued from *Greece* to *Sicily: occultas egisse vias subter mare.* The ditch was to be continued through lands *adjoining,* that is, through lands next to, and which touched, the swamp or bog meadow; but none of the lands of the plaintiffs adjoin the great swamp where the main ditch terminates, though they may adjoin the small or pine swamp at the south end of the pond.

[ * 471 ]

If the operation of cutting down the outlet is not within the letter of the permission under the act, we are certainly not warranted, in this case, to construe the power liberally, and to extend it by equity. It is not a case that concerns the public, but one of mere private convenience and profit. The preservation of the great pond and its outlet, may be as useful to the plaintiffs as the draining of the swamps would be to the defendants, and the interest of each party has an equal claim on the protection of the government; one interest ought not to be made subservient to the other. This permission to continue the ditch through adjoining lands, without the consent of the owner, ought to be strictly construed, and not carried beyond the plain letter of the act. It is an invasion of the rights of property; and it is evident that the act could only have had in view cases of the most immaterial and trifling consequence, or the power would never have been granted with so little check. We have seen that the plaintiffs could not have had any legal notice of the application to the Common Pleas, nor any agency in the appointment of the inspectors, and that the decision of the inspectors, as to the necessity and course of the ditch, is, at once, conclusive upon them. We are, therefore, required, by justice and policy, and the soundest rules of interpretation, to confine the inspectors and their operations, as they may affect strangers who have no interest in the swamps, within the strict precise limits prescribed \*by the statute. How cautiously and guardedly are powers given, even to public officers, to lay out highways for the use of the public, over private property. They are not to be laid out over cultivated grounds, without the certificate of twelve freeholders, that the road is necessary, nor through any or-

[ * 472 ]

1817.

BELKNAP
v.
BELKNAP.

chard or garden of four years' growth, without the owner's consent. Can we suppose that this act intended that these inspectors should carry their ditches where they pleased, without any regard to the improvements of others? I am entirely persuaded, that the project of draining this little lake, and thereby destroying one mill, and affecting, more or less, all the others which are supplied by its waters, is a stretch of power never within the contemplation of the act. It would be an unreasonable and dangerous construction. The power given was supposed to be harmless. It was never intended to touch and materially injure valuable improvements on adjoining lands; much less was it intended to break up useful ancient streams, and the natural and capacious reservoirs which fed them. It is most fit, therefore, that this power should be kept within the words of the act.

If I am right in the construction of the act, then the jurisdiction of the Court, and the duty of exercising it, are equally manifest. The title of the plaintiffs to the use of the outlet is undisputed, and they, and those under whom they hold, have been in the enjoyment of that right for a great number of years.

In *Finch* v. *Resbridger*, (2 *Vern.* 390.) a bill was filed to quiet the plaintiff in the enjoyment of a water-course running to his house and garden, through the ground of the defendant, and the right and long enjoyment of the plaintiff appearing, the lord keeper gave effect to the bill. Again, in *Bush* v. *Western*, (*Prec. in Ch.* 530.) the plaintiff had been in possession of a water-course for 60 years, and *the defendant interrupted it, by making a cut or channel through his own lands, and a perpetual injunction was awarded ; and it was agreed, in that case, to be usual to have such bills in this Court, in the first instance.

[ * 473 ]

These cases relate to acts of interruption by private individuals ; but there are other cases still more applicable, because they relate to the proceedings of persons acting under a statute.

Thus, in the case of *Hush* v. *The Trustees of Morden College*, (1 *Vesey*, 188.) Lord *Hardwicke* allowed an injunction to restrain turnpike commissioners from entering on the land of the plaintiff to dig gravel, as it was not a case within their authority. The lord chancellor said he should not interpose in a doubtful case, until that doubt was removed, and the matter determined at law ; but there the case was plain, and if the commissioners went beyond their jurisdiction, they were as much trespassers as private persons ; and though they might be responsible at law, that would be only for a particular wrong, and the remedy would not be equal to the remedy in this Court. In the late case

of *Shand* v. *The Aberdeen Canal Company*, (2 *Dow.* 519.) which was a *Scotch* case, determined, on appeal, in the house of lords, Lord *Eldon* said, that if the canal commissioners exceeded their powers, they became trespassers, but chancery would restrain them by injunction, and keep them strictly within the limits of their power. The case of *Agar* v. *The Regent's Canal Company*, (*Cooper's Eq. Reports*, 77.) is still more recent, being as late as 1815, and it shows that the jurisdiction of chancery on this subject is well settled, and in constant exercise, and that the cases maintain the most steady uniformity in their doctrine and belief. The bill, in that case, was filed by the plaintiff, as owner of an estate through which the defendants proposed to make a canal, under a private act of parliament. The prayer of the bill was to *re- [ * 474 ] strain the defendants from carrying the canal through his garden and brick-yard, and the injunction was allowed so far as to restrain the defendants from deviating, in cutting their canal, from the line prescribed. The lord chancellor admitted that the plaintiff might have lain by and rested on his legal rights, and then brought trespass, but he was, also, at liberty to come into chancery, in the first instance, for a preventive remedy; and if there was any dispute as to the fact, which course the defendant ought to pursue, he would direct an issue.

These cases remove all doubt on the point of jurisdiction, and the observation of Lord *Hardwicke* alludes to its pre-eminent utility. This is not a case of an ordinary trespass impending, but one great and special, leading to lasting mischief, and the destruction of the estate, and tending to multiplicity of suits. There is no fact in this case to be ascertained. The whole case turns upon the construction of the act, and, considering it in the light that I do, the prayer of the bill ought to be granted.

Let the injunction, therefore, against any proceedings on the part of the defendants, touching the outlet in the bill mentioned, be made perpetual.

Injunction continued.

N. B. The question of *costs* being afterwards agitated, *the Court* decided, that neither party should have costs, as against the other.