BALTIMORE & O. R. Co. *v.* ALLEN, Auditor, etc., and others.

*Circuit Court, W. D. Virginia.*    May 15, 1883.)

ENJOINING COLLECTION OF TAXES—FOREIGN CORPORATION—JURISDICTION OF CIRCUIT COURT—TENDER OF COUPONS OF BONDS OF STATE OF VIRGINIA—ACTS OF MARCH 30, 1871; JANUARY 14, 1882, AND JANUARY 26, 1882.

On the thirtieth of March, 1871, the state of Virginia passed a funding act, authorizing coupons, cut from her consolidated bonds, to be receivable in payment of all dues to the state.    On the fourteenth of January, 1882, she passed an act reciting that many spurious coupons were in existence, and requiring the validity of all coupons offered in payment of public dues to be tested by a specified proceeding in court.    This latter act was pronounced by the United States supreme court at its last term in *Antoni* v. *Greenhow,* 2 Sup. Ct. Rep. 91, to be constitutional and an ample remedy for the coupon-holder.    On the twenty-sixth of January, 1882, Virginia passed another act, providing that in all compulsory collections of taxes the collecting officer should receive only gold, silver, or national currency for the taxes, but also providing a method by which the tax-payer might pay in coupons to the state treasurer, after the validity of the coupons had been tested by a court proceeding defined, and thereupon receive back from the treasurer the amount of money which had been collected from him, the tax-collector.    This last act is identical, in principle and provisions, with the act of the state of Tennessee; which was reviewed by the United States supreme court in *Tennessee* v. *Sneed,* 96 U. S. 69, and pronounced constitutional, and to be an ample remedy for the coupon-holder. The Baltimore & Ohio Railroad Company, a corporation of Maryland, operating certain roads in Virginia, disregarding the acts of January 14, 1882, and of January 26, 1882, tendered the amount of taxes due to the state of Virginia in coupons of the bonds of the state, issued under the act of March 30, 1871, "receivable at and after maturity for all taxes and debts, dues and demands. due the state," which the authorities refused to receive; and having assessed 30 per cent. in addition after 60 days, and seized the property of the railroad company, threatened to sell the same for the amount of taxes and penalty, whereupon the company applied to the circuit court of the United States for an injunction.    *Held,* that the coupons tendered must be received in payment of the taxes; that the penalty was improperly assessed; and that the railroad company were entitled to an injunction to restrain the state authorities from selling their property.

HUGHES, J., dissents.

In Equity.    On motion for a preliminary injunction.

The railroad which reaches from the border of Virginia beyond

Winchester to Staunton is owned by four several companies, but it is operated by the Baltimore & Ohio Railroad Company, the complainant in this cause. The part between the state border and Winchester is owned by the Winchester & Potomac Company; that between Winchester and Strasburg is owned by the Winchester & Strasburg Company; and that between Strasburg and Harrisonburg, by the Virginia Midland Company. These three roads are under lease to the complainant. The road between Harrisonburg and Staunton is owned by the Valley Railroad Company, and is operated by the complainant. The four roads are operated practically as one line by the complainant; none but its own locomotives, cars, and trains being used upon them, and the complainant having the exclusive control of the running of the trains in all the business which is conducted. These roads are all leased by the complainant except the Valley Railroad, which seems to have a contract by which it has reserved the privilege of employing its own depot agents to collect freights, and its own conductors on passenger trains to collect tickets and fares; but the conductors are employes of the complainant for performing the same duties over the entire line. All four of the roads have as a common treasurer, W. H. Ijams, who resides in Baltimore, and has his office in Baltimore.

These railroads were assessed for state taxes in December, 1882, by the board of public works of Virginia, in pursuance of section 20 of chapter 118 of the Acts of 1881–2, p. 506. That section, after requiring certain annual reports from railroad companies, provides as follows in regard to railroads:

"Upon the receipt of every such report, it shall be the duty of the auditor of public accounts to lay the same before the board of public works, who shall * * * proceed to ascertain and assess the value of the property so reported, upon the best and most reliable information that can be procured, and to this end shall be empowered," etc. "A certified copy of the assessment, when made, shall be immediately forwarded by the secretary of the board to the president or other proper officer of every railroad * * * company so assessed, whose duty it shall be to pay into the treasury of the state, within sixty days after the receipt thereof, the tax which may be imposed thereon by law. A company failing to * * * pay the tax assessed upon its property shall be immediately assessed, under the direction of the auditor of public accounts, by any person appointed by him for the purpose, rating the value of their real estate and rolling stock at $20,000 per mile, and a tax shall at once be levied on such value at the annual rate of forty cents on the hundred dollars."

The amount of the assessment made under the first provision of this law was based on a valuation of $15,000 a mile, and was, for the three leased roads, $4,818.12, and for the Valley road $1,593.04, making a total of $6,411.16. Notice was given, during the first week in December, to W. H. Ijams, treasurer, in Baltimore, of this assessment. This notice was repeated during the week which commenced on the fifteenth of January, 1883. The taxes so notified to be due

were not paid within 60 days after the notices were sent. On this failure of payment the auditor of public accounts again assessed these roads, in accordance with the second provision of the law above cited, "rating their real estate and rolling stock at $20,000 per mile." This second assessment, of course, added 33⅓ per cent. to the former one. In pursuance of the same provision of the law, John E. Hamilton, treasurer of the county of Augusta, "appointed by the auditor for the purpose," proceeded to make a levy for the several amounts of tax thus assessed by the auditor on the following property of the complainant, viz.: On 22 freight cars at Winchester; on 1 engine and 15 freight cars at Harrisonburg; and on 24 freight cars at Staunton. He also levied on an iron safe and some furniture of the Valley company at Staunton, which was all the personalty of that company which could be found. The levies at Staunton and Winchester were made on the twenty-third of March, and that at Harrisonburg on the twenty-fourth of March last.

On the sixteenth of March, 1883, agents of the complainant had appeared at Richmond and tendered tax-receivable coupons of interest, alleged to have been cut from bonds issued by the state of Virginia, in payment of the several amounts of taxes due under the first assessment that has been described. The tender was made first to the cashier of a bank having deposits of the state under a warrant of the treasurer authorizing the bank to receive the amounts of money due for taxes, and was refused. It was then made to the treasurer and the auditor of the state successively, who each refused the coupons. The agents did not tender the taxes in gold, silver, United States treasury notes, or national bank notes, which are required to be paid in the discharge of taxes by the act of January 26, 1882, (chapter 41, § 1, p. 37, Acts 1881-2,) nor did they deliver, or offer to deliver, the coupons for verification, as required by the act of January 14, 1882, (chapter 7, p. 10, of the same volume.)

Complainant now brings this bill into this court, in which S. Brown Allen, as auditor of public accounts of Virginia; David R. Reveley, as treasurer of Virginia; and John E. Hamilton, as treasurer, residing at Staunton, who is treasurer of the county of Augusta, are made the parties defendant.

The bill recites certain acts of the general assembly of Virginia declaring that coupons of interest, such as those tendered by complainant, shall be receivable in discharge of all taxes and dues to the state; avers the tender of coupons made on the sixteenth day of March, which coupons are now brought into this court; and complains among other things of the seizure of its cars and an engine by Hamilton, the defendant; of irreparable injury sustained; of cloud upon title resulting from illegal levy; of threatened multiplicity of suits; of obstruction in the performance of its duties to the public as a common carrier; and of the penalty inflicted upon it by the second assessment. The bill prays that the said Hamilton may be forever enjoined

from further proceeding under the levies he has made; that the court will decree that the taxes first assessed were, by the tender of the coupons and by the bringing them now into this court, paid off and discharged; and that the second assessment and the levies made under it were null and void. On the filing of the bill a motion was made by complainant for a preliminary order enjoining further proceedings under the second assessment, and enjoining the sale of the property levied upon. It is that motion which the court has now to deal with.

*Hugh W. Sheffey, A. R. Pendleton,* and *W. B. Compton,* for complainant.

*Frank S. Blair,* Atty. Gen., for defendants.

BOND, J. The facts in this case, as shown by the affidavits and proofs filed, are few. The complainant is the Baltimore & Ohio Railroad Company, a corporation of Maryland, which·operates certain roads in Virginia. These roads were duly assessed for taxes by the state officers to the amount of $6,411, for which sum the complainant tendered in payment coupons of the bonds of the state of Virginia issued under the act of March 30, 1871, "receivable at and after maturity for all taxes and debts, dues and demands, due the state." Not regarding the tender as a legal settlement of the debt, the defendants, as they were required to do by the state law providing for the taxation of railroads, after 60 days' default, assessed the companies 30 per cent. in addition to their real tax as a penalty for their,default. The defendant Hamilton, as tax collector, has seized the property of the complainant, and threatens to sell it for the amount of the taxes and the penalty. The bill asks that he may be enjoined from so doing; that the tender of the coupons may be regarded as payment or extinguishment of the debt; and that the company may not be subjected to a penalty for doing what the act of March 30, 1871, contracted with the holder of such coupons he might do.

That the coupons must be received for public taxes, when tendered, the supreme court of the United States has, at its last term, emphatically decided. *Antoni* v. *Greenhow,* 2 Sup. Ct. Rep. 91. The language of the court is: "The right of the coupon-holder is to have his coupon received for taxes when offered." The fact here is that the complainant tendered coupons, and that they were rejected and the tax increased because coupons, and not money, were so offered. It is clear, then, that a right of the coupon-holder has been denied, according to the interpretation of the act of March 30, 1871, by the supreme court. What remedy has he?

In the case of *Antoni* v. *Greenhow* mandamus was sought as the remedy, but the forms of proceeding in that in Virginia were not complied with, for the reason that the complainant alleged: they were unconstitutional because they impaired the obligation of the contract. But the supreme court decided that the writ of *mandamus* now existing in Virginia did not differ so much from the remedy existing when

the coupons were issued as to impair the obligation of the contract. It expressly decided, as we have seen above, that the right of the coupon-holder was to have them received when offered; but it also decided that if he sought by *mandamus* to compel such receipt, he must follow Virginia practice in obtaining that remedy.

The allegation or claim of this complainant is that it owes no taxes; that the tender of the amount in coupons has paid or extinguished the debt. It does not ask the court to compel the tax-collector to do any act he refuses to do, but to stop him from doing an unlawful thing, namely, from taking property for taxes when none are due, and from imposing a penalty where there is no default; and, surely, although the writ of *mandamus* is altered so as to be useless for the purposes of his case, and the writ of replevin is wholly abolished in Virginia, the supreme court has not decided that the complainant has no remedy whatever. Had such been its decision it would have declared that the words "was receivable when offered" meant or should read, "was receivable after they had been reduced to judgment;" for that is the only form under which, by the writ of *mandamus,* the receipt of coupons can be compelled in Virginia.

The complainant alleges that a large part of its rolling stock on the taxed roads in Virginia is in custody; that it cannot, while such is the case, fulfill its transportation contracts, the non-performance of which will subject it to numberless suits for breach of such contracts, and to the liability of large damages.

In general the courts of equity are slow to restrain the collection of taxes. They will not do so because the tax is alleged to be void or illegal, (92 U. S. 515;) but where there will be irreparable damage, as is plain in this case, and where all taxes have been paid by the tender of coupons receivable for taxes and the complainant has been subjected to a larger assessment by reason of its offer of tax-paying coupons rather than money,—which offer the supreme court has decided it was its right to make,—I think an injunction ought to issue.

This is not alleged to be a void and illegal tax; it is asserted to be a paid one, and paid in the way complainant had a right to pay it. The bill does not seek a remedy under any of the methods of practice provided by Virginia. It appeals to the equitable jurisdiction of the United States courts. The complainant is a non-resident of this state, asserting a right which the supreme court, in *Antoni* v. *Greenhow,* as I understand it, decides that it has, and a failure to enforce which will cause it irreparable damage. The complainant has no adequate remedy at law. The writ of *mandamus* is of no avail to it; it has paid its debt once and would have to pay it again to get that remedy; it cannot get its goods back from the purchaser by replevin, for there is no such action in Virginia; it cannot sue the tax-collector for trespass, for since the institution of the suit of *Antoni* v. *Greenhow* this state has by law forbidden it to do so. Altogether, it seems

to me the complainant would be remediless and its "right" a delusion, did not a court of equity listen to it.

The argument of the attorney general that this action is not within the jurisdiction of this court, because it is, in fact, a suit against the state, which does not permit itself to be sued, does not seem to me to be sound. From the case of 9 Wheat., *Bank* v. *Osborn*, down to *The Arlington Case*, 1 Sup. Ct. Rep. 240, recently decided, this form of action has been sustained by the supreme court in proper cases.

You may not sue the state unless she consents; and if she be an indispensable party not consenting, you can maintain no action at all. But she is not a necessary party, and the complainant here can prevent his anticipated wrong and irreparable damage, by restraining the party who is about to commit it, without joining the state. *Litchfield* v. *Co. Hamilton*, 101 U. S. 781, note; *Belknap* v. *Belknap*, 2 Johns. Ch. 463. Nor does the fact that the state has provided a remedy for the complainant deprive him of any other that exists. The complainant is a non-resident of Virginia. His citizenship entitles him to apply to the United States courts for the exercise of their equitable jurisdiction in a proper case. That equitable jurisdiction was not derived from the states, but from the constitution of the United States, and remains the same, no matter what laws are passed by the states respecting legal remedies or forms of procedure. This is the proper forum of the non-resident citizen, and he is not deprived of his rights in it by the passage of any act by the legislature of Virginia respecting suits at law against the tax-collectors of the state. We have here a non-resident citizen. He seeks equitable relief against a tax-collector who is about to do an act which, if this *prima facie* case made in the bill can be maintained, will do it irreparable damage, in violation of the constitution of the United States. This jurisdiction has been exercised many times by the United States courts in like cases, and, in my judgment, the prayer of the bill should be granted and the preliminary injunction issued as prayed, and it will be so ordered.

My brother, the district judge, does not concur, and files a separate opinion.

HUGHES, J., *dissenting.* This is a suit against the state of Virginia, brought in a forum in which she has not consented to be sued in the manner chosen by this complainant. A suit against the public officers of a state, as such, seeking to control the funds of the state in their custody, or to "compel them to do acts which constitute a performance of its contract by the state," is a suit against the state itself. It is useless to cite authorities on this point. Suffice it to refer to the cases of *Louisiana* v. *Jumel*, 2 Sup. Ct. Rep. 128; *Elliott* v. *Wiltz*, Id. 128; and *Antoni* v. *Greenhow*, Id. 91, decided by the United States supreme court at the term just ended. This suit is brought, therefore, in apparent violation of the eleventh amendment of the national con-

stitution, which provides that "the judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by citizens of another state." It is true that the *gravamen* of this suit is the allegation that the state, by the action of her officers, the defendants, and by the laws under which they acted, has violated that provision of the national constitution (article 1, § 10, cl. I) which declares that "no state shall pass any law impairing the obligation of contracts." But this provision was part of the original constitution, (article 3, § 2, cl. 1,) which declared that "the judicial power of the United States should extend to controversies between a state and citizens of another state;" a clause that was held, in *Chisholm* v. *Georgia*, 2 Dall. 419, to empower the citizen of another state to sue a state of the Union without its consent in a federal court. It was to correct this evil that the eleventh amendment of the national constitution was adopted, and it is, or ought to be, obvious law that unless a state grants the right to be thus sued the right has ceased to exist; and that, if she grants it, the right can only be exercised in the manner in respect to which it shall have been granted. The eleventh amendment gives the state entire control of the remedy, so far as it concerns a federal court, which it may grant or withhold at its sovereign pleasure, and this power over the remedy being granted by the eleventh amendment, exists in full force; the clause of the original constitution, forbidding the impairment of contracts, to the contrary notwithstanding. The state of Virginia has not granted the right to be sued in the federal courts upon her contracts, except as to a remedy at law to be mentioned in the sequel; and therefore this court would seem to have no jurisdiction of the present cause, which is a suit in equity.

It is true that the supreme court of the United States, in *The Arlington Case*, cited by complainant's counsel,—*U. S.* v. *Lee*, 106 U. S. 196, [S. C. 1 Sup. Ct. Rep. 240,]—affirming this court in S. C. 3 Hughes, 37, held that the United States might be sued in the persons of its officers, under circumstances which the court was careful to define. But in explanation of this ruling two things may be said, to-wit: *First*, the eleventh amendment does not forbid a suit against the United States; and, *second*, the national constitution provides, in amendment fifth, that "no person shall be deprived of life, liberty, or property without due process of law; nor shall private property be taken for public use without just compensation." The immunity of the United States from suit is that which inheres in sovereign power, as shown with such transcendent ability by Lord SOMERS in *The Bankers' Case*, 5 Mod. 29–62. This power would have been absolute, except for this controlling and qualifying provision of the fifth amendment. In the case of the *U. S.* v. *Lee* property had been taken without just compensation, and the immunity of the United States from suit had, of necessity, to be quali-

fied in pursuance of this express inhibition of the constitution as amended; and so the suit of the dispossessed owner of Arlington was entertained.

But neither this provision of the national constitution, nor this inherent attribute of sovereignty, applies in the case at bar. The immunity of states from suit in the federal courts is an express constitutional canon; and the sale of private property for public taxes is not an appropriation of property without just compensation, or without due process of law. Whether, therefore, as to such appropriations or as to contracts, it is plain that the states have immunity from suit in United States courts under the eleventh amendment, and this suit does not lie. Nor can it be sustained on other grounds.

Injunctions to restrain the collection of public taxes are contrary to public policy. In granting them the judical department of government brings itself into conflict with the executive in the discharge of one of its most important functions, and violates that comity which should be observed between departments essentially distinct and independent in their respective powers and duties. The legislature of Virginia very jealously prohibits the state courts from granting injunctions in restraint of the collection of state taxes; and congress, in section 3224 of the Revised Statutes of the United States, forbids, in sweeping terms, "any suit" for enjoining the assessment or collection of "any" federal tax from being maintained in "any court."

When, therefore, a federal court, evading both these inhibitions, impliedly binding on it, assumes to enjoin a state in the collection of her public taxes, unless impelled by the most exigent circumstances and justified by the most cogent reasons, it transcends its proper sphere of jurisdiction, violates comity, and commits a trespass upon the most vital rights of the states. The supreme court of the United States has repeatedly condemned such proceedings, more especially in cases similar to the one at bar. *State Railroad Tax Cases*, 92 U. S. 613–617; *Dows* v. *Chicago*, 11 Wall. 108; *Hannewinkle* v. *Georgetown*, 15 Wall. 547.

Since the twenty-ninth of March last, for a period of more than six weeks, this court has stood between the state of Virginia and the collection of an important part of her public revenues One of the proceedings in which she interfered, viz., the suit which was commenced in replevin, was found to be unauthorized by law, and the court abandoned it after two weeks of obstruction. Thereupon the present proceeding was instituted, which has been pending since the sixteenth of April. Complainant's counsel endeavor to justify it on various grounds; some of them merely technical and nominal, others more deserving of serious consideration.

I will consider the more serious grounds of complaint set out in the bill. But, before dealing with them, I will first mention an obstacle in the way of this proceeding which constitutes a formidable

bar to the relief sought. Interference by a court of equity with the collection of taxes is always discouraged because of the inability of the chancery court to afford complete relief in the premises. It has no power to correct errors and repair mistakes in assessments; that being distinctly and exclusively a function of the executive. It has no jurisdiction to set the taxing machinery of the government in motion for the purpose of making levy and enforcing a legal tax in the event of the tax complained of being found to be illegal or unconstitutional. It is powerless to apportion a tax—ratifying the part that is legal and nullifying the part that is illegal. It has no power to make a new assessment or direct its collection by the proper officer. It can obstruct, but it is hopelessly impotent to accomplish what is rightful to be done; and a court which has power merely to obstruct is always slow to proceed at all. There could not be a more striking illustration of the imbecility of this court in such a cause as the present one for any but an obstructive purpose, than was given the other day by the production at bar and proffer to the court of the coupons and silver that had been tendered by complainant for these taxes. How could we know which of the coupons were spurious and which were genuine; and, as to the former, how could we consent to become the depositaries of contraband debentures. That some of the coupons are spurious is certified by the legislature of Virginia in the recitals of the act of February 14, 1882, entitled an act to ascertain and declare Virginia's share of the public debt.

Suppose we assume jurisdiction of this suit, and also of others pending here, in which jurisdiction is claimed for us in all coupon cases whatever, under section 1979 of the Revised Statutes, and under chapter 137 of the Supplement to the Revised Statutes,—the court would become the depository of hundreds of thousands of dollars in nominal value of these coupons, with no authority to do anything with them, and no jurisdiction to administer complete justice between the state of Virginia and the owners of them. The court should be slow to enter upon a proceeding which can end in no sound and perfect judicial result.

Passing from this obstacle to that complaint of the bill on which counsel lay the greatest stress, complainant avers that it had a right, under former laws of Virginia which embodied contracts with her creditors, to pay the taxes now under consideration in such coupons of interest as were tendered in this case, and that it was prevented from doing so by the observance on the part of the state's revenue officers of the provisions of the act of assembly of Virginia, passed January 26, 1882, (Acts Assem. 1881–82, c. 41, p. 37,) which allow payment in gold, silver, and treasury and bank notes only. Complainant denies the constitutionality of that act, and therefore prays that the officers seeking to collect taxes under it may be enjoined from so doing. The hearing of the present motion for a preliminary injunction, based as it is on the question of the constitutionality of

this act, is therefore equivalent to a final hearing on the merits of the bill.

The act of January 26, 1882, now assailed, is auxiliary to that of January 14, 1882, (Acts 1881–82, c. 7, pp. 10, 11, 12,) and must be considered in connection with it. The supreme court of the United States, in the case of *Antoni* v. *Greenhow*, has decided the act of January 14th to be constitutional, and has but a few days ago refused a rehearing of that case. We have, therefore, some firm ground to stand on. In order to a comparison of them, I will set out the substance of each of these acts. The supreme court described the act of January 14th as follows:

"Sections 1, 2, and 3 of the act of 1882 provide, in substance, that if coupons are tendered in payment of taxes the collector shall take and receipt for them for the purposes of identification and verification. He shall then require payment of the taxes in money, and after marking the coupons with the initials of the name of the owner, shall deliver them to the judge of the county court of the county, or hustings court of the city, where the taxes are payable. The tax-payer may then file his petition in the county or hustings court against the commonwealth to have a jury impaneled to try whether the coupons are genuine, legal coupons, which are legally receivable for taxes, debts, and demands. The commonwealth may be brought into court by service of a summons on the commonwealth's attorney. Upon this petition an issue and trial by jury is to be had, with ample privileges to all parties of exception and appeal. If the suit is finally decided in favor of the tax-payer, he is to have the amount paid by him for the taxes refunded out of the first money in the treasury, in preference to all other claims."

Of these clauses of the act thus set out in substance by itself the supreme court spoke when it said:

"A remedy which is ample for the enforcement of the payment of the money [which the act provides shall be refunded to the coupon-holder by the state treasurer] is ample for all the purposes of the contract. That, we think, is given by the act of 1882 in both forms of proceeding."

Thus we have the distinct and irreversible decision of the supreme court of the United States that the remedy of the coupon-holder afforded by the first three sections of the act of January 14, 1882, is adequate, and that those three sections are ample to discharge the constitutional obligation of the state in respect to the remedy supplied to the coupon-holder. We come, therefore, to the act of January 26, 1882, whose substance I will state. That act, after requiring that nothing but gold, silver, United States treasury notes, or national bank notes, shall be received for taxes, goes on to provide that "in all cases in which an officer shall take any steps for the collection of revenue claimed to be due the state from any citizen or tax-payer," such person, if he conceives the same to be unjust or illegal, or to be unconstitutional, etc., may pay the same under protest, and, on such payment, the officer collecting the same shall pay such revenues into the state treasury, giving notice to the treasurer that the same was paid under protest. It gives the protesting tax-payer leave, within

30 days after such payment under protest, to sue the collecting officer for the amount which had been paid, in "the court having jurisdiction of the parties and amounts."

If, in such suit, it be determined that the money was, for any reason going to the merits, wrongfully paid, and ought to be refunded, it provides that the court shall so certify of record, and that the auditor of public accounts shall issue his warrant for the amount, and that such warrant shall have preference of payment over other claims upon the treasury, except such as have priority by constitutional requirement. It provides that this shall be the only remedy "in any case of the collection of revenue, or the attempt to collect revenue illegally, or the attempt to collect revenue in funds only receivable [meaning *in such funds only as are receivable*] by said officers under this law, the same being other than, and different funds than, the tax-payer may tender or claim the right to pay." It takes away from the tax-payer the remedy by injunction, *supersedeas, mandamus,* prohibition, and all other remedy than that of suing the tax-collector as provided by this act. Observe that the clause just recited refers only to what occurs in cases of the *compulsory collection* of revenue under the act of January 26th, and does not refer to what occurs in cases where the tax-payer comes voluntarily forward to pay, as contemplated by the act of January 14th.

The act goes on to make it misdemeanor, punishable criminally, for the collecting officer to receive other funds than gold, etc. After some immaterial provisions, the act finally provides that no officer shall be subjected to any other suit than the one itself provides for any refusal on his part to accept payment of taxes in funds not authorized to be received by the act.

It is to be observed that this act comes into operation only where the tax-payer "stands passive," and puts the state to the necessity of "taking steps for the collection of taxes due." It then forbids the receipt of coupons in payment, requires payment in gold, etc., and allows the coupon-holder, after paying taxes in gold or other money, to sue the collector for the return of the money paid him. As before said, it allows him to pay under protest, and requires the collecting officer to notify the state treasurer of the protest. The suit may be brought in a state court; or, if proper circumstances of jurisdiction exist, it may be brought in a federal court; and the court may pass upon the validity of the tender of coupons, with reference either to the constitutionality of the act in forbidding the reception of them, or to the genuineness or spuriousness of the coupons tendered, or with reference to any other question going to the merits.

The fundamental error of complainant's counsel consists in assuming that this act of January 26th repeals that of January 14th. It evidently does not do so in terms, but counsel insist that it does so by implication. On the contrary, I think that by necessary implication there is no repeal. The act of January 14th provides a means

of availing of coupons in payment of taxes for "any tax-payer," "whenever he shall tender" to the proper collector "coupons detached from bonds of the commonwealth." This applies to every tax-payer. It grants him the remedy given by sections 1, 2, and 3, "whenever he shall tender" his coupons. He may make this tender at any time before "steps are taken" to collect his taxes coercively. He may make it after such "steps have been taken;" after he has brought suit against the collecting officer; and after the court in which he thus sues has passed favorably upon it.

On the other hand, the act of January 26th applies only to cases in which a collector of taxes has "taken steps" for their compulsory collection. The earlier act applies to voluntary tax-payers. The latter act applies only where the tax-payer has failed to avail of the remedy given by the earlier, and has slept upon his duty as to taxes until aroused by a levy upon his property for them. The act of January 14th covers cases where the tax-payer holds out his hands to pay the state. The act of January 26th covers cases where the state reaches forth her hand to collect from the tax-payer the tax which he neglects to pay. So far from conflicting with each other, these statutes go hand in hand, and are not only consistent, but mutually assistant. The tax-payer who schemes for time and delay may, as complainant's counsel express it, "stand passive" until the collecting officer approaches with his warrant of distraint. Aroused and coming forward, then, the tax-payer may pay in money under protest, and at once sue the officer for refusing coupons. If he succeed in his suit, he will get back his money from the state treasurer, and still avail himself of his rights under the act of January 14th, for his taxes will still remain unpaid.

The act of January 26th does not, as complainant's counsel assert, take away "all remedies" from the tax-payers against whom "steps have been" taken for compulsory collection. It only takes away injunction, *mandamus*, and the ordinary common-law remedies. It leaves the right to petition under the earlier act, which the supreme court decides to be ample in its provisions for the enforcement of the tax-payers' rights in respect to the coupons; and it leaves the right to sue under its own provisions for the restoration of the gold, silver, or other funds which have been paid under protest. Nor does the act of January 26th deprive the tax-payer of the action of trespass against the collector for an illegal levy. It, in terms, only deprives him of the right of suing such collector for a "refusal on his part to accept in payment of the revenue" the coupons or other funds, not gold, etc., which he may have tendered. The act affords no protection to Hamilton, the defendant, in this case, who made the levy on complainant's property, for no coupons have ever been tendered him, or other funds contraband under this law, and the act only protects him from suit for refusing such funds. I repeat that the act of January 26th does not repeal that of the 14th. It does not repeal

expressly. It avoids to do so in terms, and it, by necessary implication, continues the earlier act in force; even re-enforcing it by its own provisions. If it does not repeal the earlier act, then, even though it did not itself afford a remedy to the tax-payer, enabling him to exercise his constitutional privilege of paying his taxes in coupons, the supreme court has decided that the act of the 14th does afford an ample remedy; and it is not incumbent upon the state to afford more than one ample remedy for any right. If it afford no independent remedy, then the narrowest construction that can be put upon the act of the 26th is that it operates as a limitation, shutting off the right of the coupon-holder to pay his taxes in coupons, if he neglects to avail himself of the remedy afforded by the act of the 14th, and "stands passive" until his property is distrained for taxes.

The state has a right, after providing for its creditor ample remedy for enforcing an obligation of contract, to require by statute of limitation a reasonably prompt exercise of that right, and this period may, in respect to public taxes, be measured by weeks or days. Therefore, even though the law of January 26th could be held to shut off the tax-payer from paying his taxes in coupons after steps have been taken for their coercive collection, still it is constitutional, and leaves the tax-payer all the remedy to which he is entitled. But this law is more than one of limitation. It affords the tax-payer an additional remedy to that given by the act of January 14th. The supreme court of the United States has virtually so pronounced, for the act is drawn in language almost identical with that of Tennessee, which was construed by the court in *Tennessee* v. *Sneed*, 96 U. S. 69. It is a copy of that act. Its effect as to coupons is identical with that of the Tennessee statute as to state bank notes, and the point made as to its constitutionality is the same that was raised by Bloomstein and decided against him in that case. And so it is that Virginia has put two acts upon her statute-book, constitutional and affording remedy to the coupon-holder. The act of January 14th has received the express sanction of the supreme court in *Antoni* v. *Greenhow.* The act of January 26th has received that court's equally emphatic sanction in *Tennessee* v. *Sneed.*

It is to be observed, furthermore, that the language of the clause of the act of January 26th, referring to the court in which a tax-payer may sue the tax-collector, is broad enough to give jurisdiction to the federal court, and to relieve this class of suits of the inhibition of the eleventh amendment. The clause confers the right to bring such suits in any court having jurisdiction of parties and amounts; so that, whenever the tax-payer is a non-resident, and the amount of taxes due equals or exceeds the sum of $500, a circuit court of the United States would seem to have jurisdiction. Indeed, the jurisdiction may embrace all cases included in the class defined in the first section of chapter 137, p. 173, Supp. Rev. St. In the present case, the complainant company could have paid the taxes under pro-

test to Collector Hamilton, and could then have sued this collector on the law side of the circurt court for the western district of Virginia, in the mode prescribed by the act of January 26th.

If the statute gives the remedy at law in the federal court, of course the tax-payer has no other, his remedy in equity being barred by the eleventh amendment, and by the rule that where there is a remedy at law equity can give none. The supreme court of the United States, in *Tennessee* v. *Sneed*, construing precisely such a law, held that the act furnished a remedy to the tax-payer, and did not impair the contract by taking away injunction and *mandamus*. The act nowhere seeks to confine the prosecution of the remedy to the state courts. If the amount and other circumstances of the case are such as to give federal jurisdiction, nothing prevents the pursuit of the remedy at law in this court, as freely as in all cases it may be pursued in the state courts. Such being the case, the very definition of equity, that "it is the correction of that wherein the law, by reason of its universality, is deficient," seems to forbid our allowing equity to be invoked in this case, in which relief at law is adequate and complete.

Summing up what I have said on this act of January 26th, the eleventh amendment denies to complainant a remedy in the federal court, unless the state of Virginia grants the right to be sued in that forum. If she grants that right in a particular manner, no other manner can be pursued in exercising it. Having granted it in the manner prescribed by the act of January 26th, and that remedy being a remedy at law, complainant should have followed the method there prescribed; and, having been provided only with a remedy at law, complainant would have no right to resort to equity, even though the eleventh amendment did not bar its doors against him. Therefore the proceedings in equity, which complainant has instituted here, cannot be maintained.

I will now pass on to the minor grounds of complaint relied upon in the bill, one of which is that a penalty is inflicted by the second assessment on which the levies for these taxes were made; an increase of a third having been imposed in consequence of complainant's delay in paying the lesser tax first assessed. The fact that the second assessment, based, as it was, on a valuation of $20,000 per mile, proved to be greater than the first, is an accident which arose out of the peculiar circumstances attending the valuation of these particular roads. The act of April 22, 1882, requires the board of public works to make the first assessment from "the best and most reliable information that can be procured," and is in all other respects silent as to the rate of valuation at which this first assessment shall be made. It nowhere requires, indicates, or implies that this assessment shall in all cases be at a rate of valuation less than $20,000 per mile. The board of public works is required to make it from the best and most reliable information at hand. The board may make

it at the rate of $15,000 or $150,000 per mile, so far as the law is concerned; but whether the first assessment be made on the basis of fifteen, or one hundred and fifty, or forty, or ten thousand dollars a mile, if the company assessed fail to pay the tax resulting, within 60 days, then the act requires that a second assessment shall be made by the auditor, and fixes the arbitrary valuation of $20,000 a mile as the basis of it.

This provision of law is not penal, either in its terms, its spirit, or its legal effect. The only ground on which the second assessment is open to objection, with reason, would be that the valuation of $20,-000 is excessive. This is not alleged by the bill. It is notorious that such an averment could not be made with truth, and the bill refrains from making it. The assessment is strictly legal, and is not penal. By the accidents of this case the second was larger than the first assessment, and a mere hardship has resulted—resulted, too, from the laches of the complainant. Equity does not relieve from hardships of this sort, which a reasonable diligence on the part of the complainant could have averted. *Vigilantibus non dormientibus* is applicable here. Self-imposed burdens are not grounds for equitable relief.

Other of the minor complaints of the bill are urged in conformity with the ruling of the supreme court of the United States in *Hannewinkle* v. *Georgetown*, 15 Wall. 547, in which the court held that a bill to restrain the collection of a tax cannot be maintained on the sole ground of the illegality of the tax; but required that there should be either an allegation of fraud, or that the tax sale would bring a cloud upon title, or that a multiplicity of suits would be prevented, or that some other cause presenting a case for equitable relief existed.

The bill, with industrious fidelity, conforms to every suggestion of the court in this case, alleging *seriatim* each of the grounds expressly named, and re-enforcing these with other grounds, numerous enough to satisfy the most exacting requirements in that regard. It charges fraud upon the officers of the state in the assessment of this tax. It sets out no facts creating a presumption of fraud, and throwing upon the officers the burden of rebutting its allegations, but employs only general averments. The first assessment upon the four railroads was made by the board of public works, at the rate of $15,000 a mile, "from the best and most reliable information that could be procured." This was in strict compliance with the direction of section 20 of the act of April 22, 1882. The tax not having been paid within the period prescribed, the auditor, in strict compliance with the same law, made the second assessment at the rate of $20,000 a mile. The latter proceeding was expressly, positively, and peremptorily required by law, and the officer would have been derelict in duty, and would have subjected himself to the imputation of fraud, if he had not made the assessment. A third officer was deputed, in ex-

act conformity with the same law, to collect, and took the steps for collecting, the tax, in doing which this court has obstructed him. Now the presumption is always in favor of the regularity and validity of the conduct of officers engaged in the performance of their official duties, and equity will not enjoin them upon general averments that the assessment was too high. Indeed, in all cases in which fraud is relied upon, the especial facts constituting the fraud must be set forth. Distinction must also be taken between cases in which there is an entire absence of authority in law on the part of taxing officers, and cases of mistaken or wrongful execution of powers conferred by law; and the rule is that where the officer acts under valid authority, and acts within its limits, he will not be enjoined, although errors may have occurred in the exercise of the power conferred. In the case before us these conditions are not supplied, and the averment of fraud is untenable.

Another complaint is that the levies made upon complainant's property, and the sales of it advertised, create a cloud upon the title of the real estate of the four railroad companies for the taxes due for which the levies were made. If the companies owning those railroads were themselves before the court as parties to the bill, the court could hear this complaint; but coming as it does from a complainant which expressly disclaims title in the real estate referred to, it cannot be entertained. Besides, this doctrine of cloud of title applies only in cases where real estate is to be sold, and sold under proceedings which are in fact illegal, but which do not show the illegality on their face. It applies only where a court is about to sell an illegal title to real estate, and where the illegality is not to be found in the record of its proceedings. Here it is not real estate, the sale of which is sought to be enjoined, but personalty, and the objection is untenable. It is also complained that a multiplicity of suits will result from the sale of this property for these taxes. The bill does not set out with any precision *how* such a result will follow. It is certain that no multiplicity of suits yet exists. The better doctrine on this subject is that the mere apprehension of suits not yet brought will not justify the interference of equity. In general, injunction of one suit is only granted where a multiplicity of suits are actually pending, all of the same character, and involving the same question of law. The bill refers to suits about to be instituted by the other railroad companies of the state, involving this right to pay taxes with coupons; but none of them have been instituted, and the proof is that all the companies but this complainant have paid their taxes in money. Therefore, as to other railroad suits, even the apprehension of them is wanting.

As to the liability of the complainant company, as trustees for its stockholders, to actions by them for taxes paid in money, or by sale of property, which it has voluntarily tendered in coupons, the vague apprehension of suits so improbable and remote, and which would be

so untenable if brought, is not worthy of the consideration of the court. So of the equally vague apprehension intimated in the bill, of suits that might be brought against complainant as a common carrier, in consequence of its failure to serve the public effectually, because of a temporary subtraction from its rolling stock of some 60 freight cars and a locomotive. The probability of a great company, owning thousands of freight cars, and probably thousands of locomotives also, being sued for breach of its contracts as a common carrier, by reason of so diminutive a loss of rolling stock, is too remote to be considered by the court, especially as it is not averred that a single suit of the kind has yet been brought.

It is also complained that the treasurer of Augusta county, John F. Hamilton, one of the defendants, who, or his deputy, made the levies, and the seizures of property in this instance, is not pecuniarily responsible for a wrongful sale of this property in the damages that might be recovered from him in trespass; his assessed estate being only of the value of some $4,500. The argument of the bill on this head is that as this same defendant was about to make similar levies on the property of other railroad companies, the damages accruing to all would exceed any possible assets which he might possess for the satisfaction of them. But the proof in the case is that all the other railroad companies have paid the taxes due from them. There is no possibility, therefore, of any such suits, and the premises of the bill are at fault in this particular. It does not appear that Hamilton will be sued for any other seizures than those made in this case, and as it appears that he guided himself in this action by the direction of the law under which he was acting, his liability is covered by his official bond, which was stated at bar to have been given in the penalty of $200,000. The danger of loss to the complainant in this direction is not, therefore, so probable as to be worthy of the court's consideration in the present case.

The complaint just mentioned is made in aid of another complaint of the bill, that irreparable injury would be inflicted upon the complainant by the sale of the property under seizure. The Baltimore & Ohio Railroad Company is too wealthy and powerful to be irreparably injured by these seizures, except, comparatively speaking, to a most diminutive extent. The injury could have been averted in the first instance by taking the steps pointed out by law for verifying the coupons with which the complainant sought to pay the taxes—a law recently pronounced valid by the supreme court of the United States. Even now the measure of irreparable injury threatened is that which would result from first tendering the coupons and advancing the amount of taxes in money, and then obtaining a reimbursement of the money advanced by having the coupons verified according to law. Any injury with which it is threatened is reparable by the procedure indicated, which the court is bound to consider as having been provided in good faith. The court, therefore, must disregard complain-

ant's apprehension of an irreparable injury which seems to have been self-imposed.

A sale of complainant's property by due process of law for the satisfaction of taxes, which may be avoided by complying with a law which, however onerous it may be in respect to men of small means, who are required to verify very small amounts of coupons, yet subjects holders of large amounts to neither an onerous nor an unreasonable proceeding for verification, cannot be regarded as inflicting an irreparable injury, either practically or theoretically.

Still another complaint of the bill is the interruption which the seizure of its rolling stock is alleged to produce in the performance of complainant's duties to the public as a common carrier. If the four companies owning these local railroads were complainants, and if they owned only the quantity of rolling stock properly belonging to short local roads, these seizures might be really amenable to the complaint of the bill in this particular. But the complainant is one of the most wealthy railroad corporations in the world, having unlimited command of all the appliances and instrumentalities for conducting the immense business of its main stem and the auxiliary roads under its control. Its operations are on so large a scale as to be part of the public history of the times, and the court may take judicial cognizance of the amplitude of its resources as to rolling stock. It is hardly possible to believe that the complainant's power to serve the public as a common carrier is appreciably affected by the, to it, inconsiderable levies made by Hamilton, the defendant in this case; and this complaint is untenable. All these minor complaints seem to me to be frivolous; and hardly worthy of the serious attention I have given them. They certainly are not sufficient to justify an injunction against the collection of public taxes.

I think the case is ruled by *Antoni* v. *Greenhow* and *Tennessee* v. *Sneed;* and I am constrained to deny the motion for a preliminary injunction.

---

The counsel of the respective parties consented to a decree on the basis of Judge BOND's decision, and the case was certified to the supreme court of the United States on a division of opinion.

Restraining collection of tax. See *Second Nat. Bank* v. *Caldwell*, 13 FED. REP. 429, and note, 434–439.—[ED.

---

1. IMMUNITY OF SOVEREIGN FROM SUIT. Sovereignty, under God, inheres in the organic people, or the people *as the republic;* and every organic people fixed to the soil, and politically independent of every other people, is a sovereign people, and, in the modern sense, an independent sovereign nation.[1] The people themselves—the *entire mass* of persons who compose the political society—are the true nation,—the final, permanent depositary of all power.[2] Such

---

[1] Brownson, Amer. Repub. 192.     [2] Pomeroy, Const. Law, § 37.

a political society is a nation, and this nation possesses political sovereignty.[1] But the nation must exist as an historical fact, prior to the possession or exercise of sovereign power,—prior to the existence of written constitutions and laws of any kind,—and its existence must be established before they can be recognized as having any legal force or validity.[2] The organized government, whatever be its form and character, is but the creature and servant of this political unit, which alone possesses dominion in itself.[3] The rule of the common law, that the sovereign cannot be held amenable to process in his own courts without his consent, is applied in this country to the state, under which designation are included the people within its territorial limits, in whom resides whatever sovereignty the state possesses.[4] That the supreme power in a state cannot be compelled by process of courts of its own creation to defend itself from assaults in those courts, is a fundamental principle that has been adopted in the courts of this country as a part of the general doctrine of publicists.[5] This maxim is not limited to a monarchy, but is of equal force in a republic. In the one, as in the other, it is essential to the common defense and general welfare that the sovereign should not, without its consent, be dispossessed of its property.[6] It would be inconsistent with the very idea of supreme executive power, and would endanger the performance of the public duties of a sovereign, to subject him to repeated suits as a matter of right at the will of any citizen, and to submit to the judicial tribunals the control and disposition of his public property, his instruments and means of carrying on his government in war and in peace, and the money in his treasury.[7] This principle of immunity from suit applies to every sovereign power, and but for the protection which it affords the government would be unable to perform the various duties for which it was created.[8] The principle that no sovereign can be sued without its consent, applies equally to foreign sovereigns, and to sovereigns of the country where the suit is brought. The exemption of the sovereign is not less regarded by its own courts than by the courts of other sovereigns.[9] In the words of Chief Justice TANEY, "it is an established principle of jurisprudence in all civilized nations that the sovereign cannot be sued in its own courts, *or in any other*, without its consent and permission." [10]

2. STATUTES CONFERRING RIGHT TO SUE THE STATE — REPEAL. The state may, however, if it thinks proper, waive this privilege, and permit itself

1 Pomeroy, Const. Law, § 41. See, also, Chisholm v. Georgia, 2 Dall. 433, 435; Penhallow v. Doane, 3 Dall. 93; Cherokee Nation v. Georgia, 5 Pet. 52; Texas v. White, 7 Wall. 700; 1 Kent, Comm. 188; Story, Const. §§ 207, 208; 1 Phillimore, Internat. Law, 77; Wheaton, Internat. Law, (Dana's Ed.) §§ 17, 20; Field, Internat. Code, §§ 2, 12; Vattel, Prelim. §§ 1, 2; Morse, Citizenship, § 2; 1 Toullier, n. 20; Merlin, Repert.; Lieber, Hermeneutics, 259.

2 Brownson, Amer. Repub. 201; Pomeroy, Const. Law, § 86.

3 Pomeroy, Const. Law, §§ 37, 86-91.

4 State v. Jumel, 2 Sup. Ct. Rep. 142; Elliott v. Wiltz, Id., per FIELD, J.

5 Cohens v. Virginia, 6 Wheat. 264, 411; United States v. Clarke, 8 Pet. 436-444; Cary v. Curtis, 3 How. 236, 245, 256; U. S. v. McLemore 4 How. 286-289; Hill v. U. S. 9 How. 386, 389; Reeside v. Walker, 11 How. 272, 290; Beers v. v. Arkansas, 20 How. 527, 529; Nations v. Johnson, 24 How. 195; De Groot v. U. S. 5 Wall. 419, 431; U. S. v. Eckford, 6 Wall. 484, 488; The Siren, 7 Wall. 152, 154; The Davis, 10 Wall, 15, 20; U. S. v. O'Keef, 11 Wall. 178; Case v. Terrell, 11 Wall. 199, 201; Carr v. U. S. 98 U. S. 433, 437;

U. S. v. Thompson, 98 U. S. 486, 489; Railroad Co. v. Tennesee, 101 U. S. 337; Railroad Co. v. Alabama, 101 U. S. 832; U. S. v. Lee, 106 U. S. 196; 1 Sup. Ct. Rep. 240; State v. Jumel 2 Sup. Ct. Rep. 128; Ex parte Dunn, 8 S. C. 207; Treasurers v. Cleary, 3 Rich. (S. C.) 372; People v. Dennison, 84 N. Y. 272; People v. Miles, 56 Cal. 401; Chicago, M. & St. P. Ry. Co. v. State, 53 Wis. 509; Raymond v. State, 54 Miss.562; Chevalher's Adm'r v. State, 10 Tex. 315; Tracy v. Hornbuckle, 8 Bush, 336; Tate v. Salmon, (Ky. Ct. Appeals,) 13 Reporter, 144; Rollo v. Andes Ins. Co. 23 Grat. 515; State v. B. & O. R. Co. 34 Md. 311; State v. Hill, 54 Ala. 67; Ex parte State, 52 Ala. 231; Owen v. State, 7 Neb. 108; Pattison v. Shaw, 6 Ind. 377; Briggs v. The Light-boats, 11 Allen, 162.

6 U. S. v. Lee, 106 U. S. 196; 1 Sup. Ct. Rep. 240; The Siren, 7 Wall. 152.

7 Briggs v. The Light-boats, 11 Allen, 162.

8 Nichols v. U. S. 7 Wall. 122, 126.

9 U. S. v. Lee, 106 U. S. 196; 1 Sup. Ct. Rep. 240; The Exchange. 7 Cranch, 116; Vavassour v. Krupp, 9 Ch. Div. 351; The Parlemente Belge, 5 Prob. Div. 197; Briggs v. The Light-boats, 11 Allen, 162.

10 Beers v. Arkansas, 20 How. 529.

to be made a defendant in a suit by individuals or by another state;[1] but if, in the liberality of legislation, it does permit itself to be sued, it is only on such terms and conditions as are prescribed by statute;[2] for there is vested in no officer or body the authority to consent that the state shall be sued, except in the law-making power;[3] and whoever institutes proceedings against the state must bring himself within some statute authorizing such suit.[4] As this permission is purely voluntary on the part of the sovereignty, it follows that it may prescribe the terms and conditions on which it consents to be sued, and the manner in which the suit shall be conducted, and may withdraw its consent whenever it may suppose that justice to the public requires it.[5] Statutes permitting suits against the state are matters of grace, confer privileges,—they do not create rights,—and are always construed like other statutes conferring privileges or exemptions on the citizen. The power to withdraw is commensurate with the power to confer; and when the privilege is withdrawn, the citizen is remitted to the condition in which he stood when it was conferred.[6] All obligations or liabilities resting upon the state, being creations of the legislative power of the state, it is the good faith of the state alone on which reliance is placed to perform the obligation or discharge the liability. Legal remedies, or their efficacy in enforcing the obligation or liability, are not contemplated as in cases of contracts between individuals.[7] If the state furnishes a remedy by process against itself or its officers, that process may be pursued, because it has submitted itself to that extent to the jurisdiction of the courts; but if it chooses to withdraw its consent by a repeal of all remedies, it is restored to the immunity from suit which belongs to it as a political community, responsible in that particular to no superior.[8]

3. SUITS AGAINST THE SEVERAL STATES — ELEVENTH AMENDMENT TO CONSTITUTION. In our system of jurisprudence these principles are as applicable to each of the states as they are to the United States, except in those cases where by the constitution a state of the Union may be sued in the supreme court of the United States.[9] It is provided by the eleventh amendment to the constitution of the United States that no state can be sued in the courts of the United States by a citizen of another state. The evident purpose of this amendment was to prohibit all suits against a state by or *for* citizens of other states, or aliens, without the consent of the state to be sued; and one state cannot create a controversy with another state, within the meaning of that term as used in the judicial clauses of the constitution, by assuming the prosecution of debts owing by the other state to its citizens.[10] It was intended to operate in the interest of, and for the protection of, the several states, and it cannot be so construed as to allow the property of a state to be alienated or conveyed in a suit in equity against a subordinate official of the state.[11] When a state submits itself without reservation to the jurisdiction of a court in a particular case, that jurisdiction may be used to give full effect to what the state has, by its act of submission, allowed to be done.[12] And it is held by MATTHEWS, BRADLEY, and GRAY, JJ., that the only remedies which the courts

[1] Beers v. Arkansas, 20 How. 527, 529; Ex parte State, 52 Ala. 235.

[2] Nichols v. U. S. 7 Wall. 122, 126.

[3] The Davis, 10 Wall. 15; U. S. v. Lee, 106 U. S. 196; 1 Sup. Ct. Rep. 240.

[4] State v. Hill, 54 Ala. 67; Owen v. State, 7 Neb. 108; Ex parte Dunn, 8 S. C. 207; The Siren, 7 Wall. 152; U. S. v. Clarke, 8 Pet. 444; Tate v. Salmon, 13 Reporter. 144.

[5] Beers v. Arkansas, 20 How. 527, 529; The Davis, 10 Wall. 15.

[6] Ex parte State, 52 Ala. 235.

[7] Ex parte State, 52 Ala. 235. Compare Hancock v. Walsh, 3 Woods, 363; Dabney v. State Bank, 3 S. C. 167; Clark v. State, 7 Cold. 317-318; Danolds v. State, 89 N. Y. 36; dissenting opinions of FIELD and HARLAN, JJ., in Antoni v. Greenhow, 2 Sup. Ct. Rep. 91, and State v. Jumel, Id. 128.

[8] Antoni v. Greenhow, 2 Sup. Ct. Rep. 103, per MATTHEWS, J.

[9] Railroad Co. v. Tennessee, 101 U. S. 337; Railroad Co. v. Alabama, Id. 182; U. S. v. Lee, 106 U. S. 196; 1 Sup. Ct. Rep. 240.

[10] State v. State, 2 Sup. Ct. Rep. 176.

[11] Preston v. Walsh, 10 Fed. Rep. 328.

[12] State v. Jumel, 2 Sup. Ct. Rep. 142; Elliott v. Wiltz, Id.

of the United States are authorized to administer, are the remedies that the state itself has provided, and that no remedy is provided by the constitution of the United States against the state itself for a breach of its contract by the state.[1]

4. SUITS AGAINST THE OFFICERS OF A STATE. Where an officer of the state, in violation of law, commits an act to the injury of the citizen, it is an act beyond the scope of his agency, unauthorized by his principal, and the state is not liable, therefore, to the party injured;[2] and where an officer is proceeding under an unconstitutional law to the injury of the citizen, such law will not protect him from a suit on the ground that a suit against him is virtually a suit against the state.[3] With this limitation, however, the officers of a state, in the official discharge of their duties, are entitled to the same immunity from suit that the state, *eo nomine*, would be entitled to. We will briefly review the cases bearing upon this point.

In *The Queen* v. *Powell*[4] a writ of *mandamus* to admit to a copy-hold tenement of a manor, belonging to the crown, was directed to the steward alone, on the ground that there could be no *mandamus* to the sovereign, and Lord DENMAN, with the concurrence of Justices LITTLEDALE, WILLIAMS, and COLERIDGE, quashed the writ, and after observing that doubtless there could be no *mandamus* to the sovereign, but that the interests of the crown were to be as much guarded as those of the subject, said: " If we were to allow a *mandamus* to the steward alone, and the writ were obeyed, the property of the crown would be affected indirectly by the *mandamus* to the steward alone, when it cannot be affected directly by making the sovereign a party to the *mandamus; * * ** and if the advisers of the crown were of opinion its interest might be affected, and were to advise the sovereign either to order the steward not to admit the prosecutor of the *mandamus* or to revoke the appointment of the steward, this court could not grant an attachment against the party, and then the party does not get admitted."

In *The Queen* v. *Comr's of Treasury*,[5] in which the court refused to grant a writ of *mandamus* to the lords commissioners of the treasury to compel them to pay over money in their hands as servants of the crown, Lord Chief Justice COCKBURN said: " I take it for granted with reference to that jurisdiction that we must start with this unquestionable principle: that when a duty has to be performed (if I may use that expression) by the crown, this court cannot claim, even in appearance, to have any power to command the crown; the thing is out of the question. Over the sovereign we can have no power. In like manner, where the parties are acting as servants of the crown, and are amenable to the crown, whose servants they are, they are not amenable to us in the exercise of our prerogative jurisdiction. * * * Though I quite agree that according to the appropriation they (the lords commissioners) were bound to apply the money, upon the vouchers being produced, and had no authority to retax these bills, still I cannot say that there is any duty which makes it incumbent on them to do what I cannot say they ought to have done, except as servants of the crown, because in that character they have received the money, and no other."

BLACKBURN, J., in the same case,[6] remarked: " It seems to me that the obligation, such as it is, is upon her majesty, to be discharged through her servants, and *you cannot proceed, therefore, against the servants.*"

Where an injunction to restrain the auditor and treasurer of the state of

1 Antoni v. Greenhow. 2 Sup. Ct. Rep. 91. See Preston v. Walsh. 10 Fed. Rep. 328.

2 Dabney v. State Bank, 3 S. C. 167; Belknap v. Belknap, 2 Johns. Ch. 463. See Spring Valley Water-works v. Bartlett, 16 Fed. Rep. 615.

3 State Lottery Co. v. Fitzpatrick, 3 Woods, 323; Claybrook v. Owensboro, 16 Fed. Rep. 297; Hancock v. Walsh, 3 Woods, 360; Lynn v Polk, 8 Lea, (Tenn.) 131; Davis v. Gray, 16 Wall. 203.

4 1 Q. B. 352; S. C. 4 Perry & D. 719.

5 L. R. 7 Q B. 387–394.

6 Id. 399.

Louisiana from disposing of money in the state treasury to the prejudice of complainant, and a *mandamus* to compel the payment to him of interest on state bonds, held by him, was asked for, it was held that the proceedings were in effect a suit against the state, and that as the state could not be sued the court had no jurisdiction.[1]

Where an action was brought by an insurance policy-holder to compel the state treasurer of Kentucky (Tate) to deliver to the receiver of the company, for the benefit of its policy-holders, a certain fund deposited with the treasurer by the company as a condition to doing business in the state, (Act of March 4, 1870, § 47,)[2] the petition was dismissed. LEWIS, C. J., in delivering the opinion, said: " The general assembly has not seen proper to enact a general law (as by article 8, § 6, of the constitution they have power to do) authorizing such suits to be brought, or conferred upon any court of the state jurisdiction to control and distribute the funds in the custody of the treasurer. It has been repeatedly decided by the court that, in the absence of a law authorizing it, the state cannot be made a party defendant or garnishee, and is not suable in her own courts, and 'that parties will not be allowed to evade this inhibition by ignoring the state in their suits, and proceeding directly against the public officer having custody of the money sought to be reached.' As no law has been passed by the general assembly for the disposal of the fund, it must remain in the custody of the treasurer, subject to such use or appropriation as may hereafter be provided by law, and no suit to recover or dispose of the fund can be maintained until the general assembly shall direct in what manner and in what court it may be brought."

And where a similar fund was sought to be reached by attachment, BLATCHFORD, J., declared that "there was no case of acknowledged authority which held that a public officer of a state, charged with a trust created by a public statute of the state in respect to funds or securities in his possession, could be made liable in respect to them by an attachment in favor of a person not claiming under the trust."[3]

In *Lynn* v. *Polk*[4] it was held that an officer, while executing a void and unconstitutional law, is not to be considered as acting under the authority of the state, and that a suit to enjoin the funding board (created by an act which the court held to be unconstitutional) from funding the bonded indebtedness of the state was not a suit against the state, nor against the officers of the state, within the meaning of chapter 13 of the Tennessee acts of 1873.

The commissioners appointed under an act of the legislature of New York to drain what was known as the great swamp, exceeded their authority, and proceeded in a manner not authorized by the act, to the threatened injury of private land-owners, and it was held they could be restrained by a court of equity.[5]

In *State Lottery Co.* v. *Fitzpatrick*[6] the officers of the state of Louisiana, charged with the enforcement of the penal laws, were enjoined from arresting or otherwise interfering with the officers and agents of the lottery company for acts done by them in the exercise of the rights conferred by their charter, which the court held could not be repealed by a subsequent act of the legislature without impairing the obligation of contract, and that as the officers were

1 State v. Burke, 33 La. Ann. 498; State v. Jumel, 2 Sup. Ct. Rep. 128.

2 Tate v. Salmon, 13 Reporter, 144.

3 Providence & S. Steam-ship Co. v. Virginia F. & M. Ins. Co. 11 Fed. Rep. 287. As to garnishment or attachment of public funds, see Buchanan v. Alexander, 4 How. 20; Averill v. Tucker, 2 Cranch, C. C. 544; Stillman v. Isham, 11 Conn. 124; McMeekin v. State, 4 Eng. (Ark.) 553; Wild v. Ferguson, 23 La. Ann. 752; Tracy v. Hornbuckle, 8 Bush, 336; Rollo v. Andes Ins. Co. 23 Grat. 509; Bank v. Debrill, 3 Sneed, (Tenn.) 378; Bank v. Hodge, 3 Rob. (La.) 373; Spalding v. Imlay, 1 Root, 551; Wicks v. Bank, 12 Ala. 584; Dobbins v. Railroad Co. 37 Ga. 240; Mayor, etc. of Baltimore v Root, 8 Md. 95.

4 8 Lea, (Tenn.) 121.

5 Belknap v. Belknap, 2 Johns. Ch. 463.

6 3 Woods, 223.

acting under a void and unconstitutional law, which could neither authorize nor protect, they could be called to answer and were individually responsible.

In *Hancock* v. *Walsh*,[1] in which the commissioner of the general land-office of Texas was enjoined from allowing location of land within what was known as the Mercer colony, there was no act of the legislature imposing upon him the duty of location within the Mercer colony;[2] and, if there had been, the court held that such law would have been unconstitutional and void; and WOODS, J., in delivering the opinion said: "If defendant violates the provisions of a contract protected by the constitution of the United States, it is immaterial whether he is doing it with or without the apparent sanction of a law of this state, and no claim that defendant is performing an official duty will avail him."[3]

In *Preston* v. *Walsh*[4] the same view was taken and an injunction granted, but the court refused to grant relief in the nature of specific performance of contract, or at least a decree for title, on the ground that to effect a conveyance of title emanating from the state to public lands, the governor of the state would have to be made a party to the suit; and PARDEE, J., who delivered the opinion, said: "The case of *Davis* v. *Gray*,[5] affirming *Osborne* v *Bank*,[6] on the subject of making and requiring the state to be made a party where the state is concerned, is very strong, and I feel bound to go as far as that case; but I must leave to the supreme court to go further, or declare the law that the courts of the United States can go further."[7]

In *McCauley* v. *Kellog*,[8] WOODS, J., held that an action in a court of the United States against the executive officers of a state in their official capacity, to compel them to comply with a contract of the state by the enforcement of its laws, is to all intents and purposes an action against the state, and prohibited by the eleventh amendment to the constitution of the United States; and after showing that in *Davis* v. *Gray* and *Osborne* v. *Bank* the officers were acting under a void and unconstitutional law, says: "No case has yet decided that a circuit court of the United States can compel the executive and administrative officers of a state to execute the laws of a state:[9] * * * I have conceded what complainants claim, that the funding bill and the act of March 14, 1874, are both unconstitutional and void, and have regarded the bill just as if those acts had never been passed, to-wit, a bill to compel the defendants, officers of the state, to execute its laws."[10]

Where negro slaves were illegally taken from the owner on the high seas, and afterwards sold to a stranger, who, without the privity of the owner, imported them into the United States in violation of law, and they were seized by an officer of the customs of the United States and delivered to an agent appointed by the governor of Georgia, in conformity to an act of congress, and some of them sold by order of the governor of the state, and the money obtained at the sale was "actually in the treasury of the state, mixed with its general funds," and the rest of the slaves remained in the hands of the agent of the state, "in possession of the government," a libel in admiralty by the owner to recover possession of the money and slaves, though not brought against the state by name, but against the governor in his official capacity, was held to be a suit against the state, and therefore, by reason of the eleventh amendment of the constitution, not maintainable.[11]

In *U. S.* v. *Peters*,[12] in which a *mandamus* was ordered to a district court of

---

[1] 3 Woods, 360.
[2] Id. 364.
[3] Id. 365.
[4] 10 Fed. Rep. 315.
[5] 16 Wall. 203.
[6] 9 Wheat. 738.
[7] Preston v Walsh, 10 Fed. Rep. 323.

[8] 2 Woods, 13.
[9] Id. 22.
[10] Id. 23.
[11] Governor v. Madrazo, 1 Pet. 110. See, also, Ex parte Madrazza, 7 Pet. 627.
[12] 5 Cranch, 115.

the United States, sitting in admiralty, to issue an attachment against the executrixes of David Rittenhouse to enforce obedience to a decree of that court for the payment of money, (although Rittenhouse had been the treasurer of Pennsylvania, and the legislature of that state had directed its attorney general to sue the executrixes for the recovery of the money, and the governor to protect them against any process of the federal courts,) the judgment of the supreme court, as stated by Chief Justice MARSHALL, went upon the ground that it was apparent that *Rittenhouse held the money in his own right,* and that "the suit was not instituted against the state or *its treasurer,* but against the executrixes of David Rittenhouse for the proceeds of a vessel condemned in the court of admiralty, which were admitted to be in their possession. *The state of Pennsylvania had neither possession of, nor right to, the property* on which the sentence of the district court was pronounced;" and the court carefully avoided expressing an opinion upon a case in which the money sued for was in the possession of the state, "or the *actual property of the state,* however wrongfully acquired."

In *Osborne* v. *Bank U. S.*[1] the bill was originally filed by the bank against the auditor of Ohio, and a collector employed by him, (the treasurer being subsequently made a defendant by amended bill,) *to prevent them from levying* a tax imposed by the legislature of that state in *violation of the constitution* of the United States upon the property of the bank; and they, after the service of the *subpœna, forcibly* took from the plaintiff's office the amount of the tax in money and paid it over to the treasurer of the state, who received it with notice of the facts and kept it apart from other moneys belonging to the state; or, in the language of Chief Justice MARSHALL, it was "kept untouched, in a trunk by itself, as a deposit, to await the event of the pending suit respecting it," so that it had never come into the possession of the state; and, as said by Chief Justice WAITE in his review of the case,[2] "was in legal effect stopped while passing from the bank to the treasury. The money seized was kept out of the treasury, because if it got in it would be irretrievably lost to the bank, since the state could not be sued to recover it back. No one pretended that if the money had been actually paid into the treasury it could have been got back from the state by a suit against the officers. They would have been *individually* liable for the unlawful seizure and conversion, but the recovery would be against them *individually* for the wrongs they had *personally* done, and could have no effect on the money which was held by the state."

In *Davis* v. *Gray*[3] the receiver of a land-grant railroad obtained an injunction against the governor and commissioner of the land-office of Texas to restrain them from incumbering, by granting patents to others, lands of which the railroad had the equitable title under a previous grant from the state, and the ground upon which the bill in that case was sustained, was defined to be that when a plain official duty, requiring no exercise of discretion, is threatened to be violated by some positive official act, any person who will sustain personal injury thereby, for which an adequate remedy at law cannot be had, may have an injunction to prevent it, notwithstanding the officer pleads the authority of an *unconstitutional* and therefore *void law* for the violation of his duty.

It is conceded, in *The Siren*[4] and *The Davis,*[5] that without an act of congress no direct proceedings can be instituted against the government or its property, and in the latter case it is justly observed that "the possession of the government can only exist through its officers; using that phrase in the sense

1 9 Wheat. 738.                          4 7 Wall. 152.
2 State v Jumel, 2 Sup. Ct. Rep. 139.     5 10 Wall. 15.
3 16 Wall. 203.

of any person charged on behalf of the government with the control of the property, coupled with actual possession."

In *Carr* v. *United States* [1] it is said: "If a proceeding would lie against the officers as individuals, in the case of a marine hospital, it might be instituted with equal facility and right in reference to a post-office or a custom-house or a prison or a fortification. In some cases it might not be apparent, until after suit brought, that the possession attempted to be assailed was that of the government; but when this is made apparent by the pleadings or the proofs, the jurisdiction of the court ought to cease."

In *Board of Liquidation* v. *McComb* [2] the board of liquidation of the state of Louisiana was enjoined, at the instance of bondholders, from admitting to the privileges of the compromise proposed by the state of Louisiana, certain persons other than those originally provided for, and on different terms, because the board was, by the terms of the law, charged with the duty of exchanging the bonds specifically set apart by the contract for a particular purpose. They in fact held the new issue of bonds in trust, and every one who gave up his old obligations, and accepted the new in settlement thereof, became a beneficiary under the trust, and entitled to a faithful performance of the terms thereof by the trustees or board of liquidation. It was, in fact, a suit by *cestui que trust* against trustees.

In the *Arlington Case*, [3] Mr. Justice MILLER, in delivering the opinion of the majority of the court, says: "While acceding to the general proposition that in no court can the United States be sued directly by original process as a defendant, there is abundant evidence in the decisions of this court that the doctrine, if not absolutely limited to cases in which the United States are made defendant by name, is not permitted to interfere with the judicial enforcement of the established rights of plaintiffs when the United States is not a defendant or a necessary party to the suit;" and, after reviewing the cases decided in the supreme court, concludes "that the proposition that when an *individual* is sued in regard to property which he holds as an officer or agent of the United States, his possession cannot be disturbed, when that fact is brought to the attention of the court, has been overruled and denied," * * * and "that the court has held the principle to be unsound; and in the class of cases like the present, represented by *Wilcox* v. *Jackson*, [4] *Brown* v. *Huger*, [5] and *Grisar* v. *McDowell*, [6] it was not thought necessary to re-examine a proposition so often and so clearly overruled in previous well-considered decisions."

The extent to which this opinion goes is stated in the Louisiana cases, [7] decided at the same term, to be, "that the officers of the United States, holding in their official capacity the possession of lands to which the United States had no title, could be required to surrender their possession to the rightful owner, even though the United States were not a party to the judgment under which the eviction was to be had;" and the case was decided upon the ground that the possession and retention of the property by the officers of the United States were in violation of the constitutional provision declaring that "no person * * * shall be deprived of life, liberty, or property without due process of law, nor shall private property be taken for public use without just compensation;" and the court held that "undoubtedly those provisions of the constitution were of that character which it was intended the courts should enforce, when cases involving their operation and effect were brought before them;" and the court considered the case upon its merits, refusing to dismiss for

---

[1] 98 U. S. 433.

[2] 92 U. S. 531. See, also, Chaffraix v. Board of Liquidation, 11 Fed. Rep. 638; Providence & S. Steam-ship Co. v. Virginia F. & M. Ins. Co. 11 Fed. Rep. 287.

[3] U. S. v. Lee, 106 U. S. 196; 1 Sup. Ct. Rep. 240.

[4] 13 Pet. 498.

[5] 21 How. 305.

[6] 6 Wall. 363.

[7] State v. Jumel, 2 Sup. Ct. Rep. 142; Elliot v. Wiltz, Id. 142.

want of jurisdiction, on the mere suggestion that the United States was the real party in interest.

The Chief Justice, and GRAY, BRADLEY, and WOODS, JJ., did not concur in the judgment of the majority of the court, and Mr. Justice GRAY, in his elaborate dissenting opinion, uses the following forcible language:[1] "The principle upon which we are of opinion that the court below had no authority to try the question of the validity of the title of the United States in this action, and that this court has, therefore, no authority to pass upon that question, may be briefly stated, thus: The sovereign is not liable to be sued in any judicial tribunal without its consent. The sovereign cannot hold property except by agents. To maintain an action for the recovery of possession of property held by the sovereign through its agents, not claiming any title or right in themselves, but only as the representatives of the sovereign, and in its behalf, is to maintain an action to recover possession of the property against the sovereign; and to invade such possession of the agents, by execution or other judicial process, is to invade the possession of the sovereign, and to violate the fundamental maxim that the sovereign cannot be sued. * * * In those cases in which judgments have been rendered by this court against individuals concerning money or property in which a state had an interest, either the money was in the *personal possession of the defendants, and not in the possession of the state,* or the suit was to restrain the defendants by injunction from doing acts *in violation of the constitution of the United States.*"[2]

In *Antoni* v. *Greenhow*,[3] decided a few months later than the *Arlington Case*, Mr. Justice MATTHEWS, who had concurred in the majority opinion in that case, distinctly states that "a suit to compel the officers of a state to do the acts which constitute a performance of its contract by the state is a suit against the state itself," and that the case was within the principle laid down in *State* v. *Jumel.*[4] To this proposition both BRADLEY and GRAY, JJ., expressly declared their assent.

In *Antoni* v. *Greenhow*,[5] a judgment of the supreme court of appeals of Virginia, denying a writ of *mandamus* to compel the treasurer of the city of Richmond, the lawful tax-collector, to accept in payment of state taxes a coupon whose genuineness had not been ascertained according to a law passed subsequent to the act under which the bonds and coupons were issued and made receivable in payment of taxes, and which, it was contended, impaired the obligation of contract, was affirmed, a majority of the court holding, upon an examination of the earlier cases, that the law which the officer pleaded in justification of his refusal to accept the coupon was not unconstitutional and void, as claimed.

In the Louisiana cases[6] the suits were brought by creditors at large of the state of Louisiana to compel the officers of the state, by judicial process, to enforce the provisions of the consolidation revenue act of 1874, funding the indebtedness of the state, and providing for an annual levy of taxes, when the state had, by an amendment to the constitution, adopted in 1879, undertaken to prohibit them from doing so. Chief Justice WAITE, who delivered the opinion, said: "Neither was there when the bonds were issued, nor is there now, any statute or judicial decision giving the bondholders a remedy in the state courts or elsewhere, either by *mandamus* or injunction against the state in its political capacity to compel it to do what it has agreed should be done, but which it refuses to do. * * * The persons sued are the executive officers of the state, and they are proceeded against in their official capacity.

---

1 U. S. v. Lee, 106 U. S. 196; 1 Sup. Ct. Rep. 240.　　5 2 Sup. Ct. Rep. 91.
2 Id.　　6 State v. Jumel, 2 Sup. Ct. Rep. 128; Elliott v,
3 2 Sup. Ct. Rep. 91.　　Wiltz, Id.
4 2 Sup. Ct. Rep. 128.

\* \* \* The question is whether the contract [between the state and the bondholders] can be enforced, notwithstanding the constitution, by coercing the agents and instrumentalities of the state, whose authority has been withdrawn in violation of the contract, without having the state itself a party to the proceeding."

After reviewing the authorities, and distinguishing the case from *Osborn* v. *Bank*,[1] *Davis* v. *Gray*,[2] and *Board of Liquidation* v. *McComb*,[3] the chief justice concludes as follows:[4] "When a state submits itself, without reservation, to the jurisdiction of a court in a particular case, that jurisdiction may be used to give full effect to what the state has, by its act of submission, allowed to be done; and if the law permits coercion of the public officers to enforce any judgment that may be rendered, then such coercion may be employed for that purpose. But this is very far from authorizing the courts, when a state cannot be sued, to set up its jurisdiction *over the officers in charge of the public moneys*, so as to control them as against the political power in their administration of the finances of the state. In our opinion, to grant the relief asked for in either case would be to exercise such a power." The relief asked was accordingly denied.

The position taken by Mr. Justice FIELD and Mr. Justice HARLAN in their dissenting opinions in *Antoni* v. *Greenhow*[5] and the Louisiana cases,[6] that in the former the statute of the state of Virginia was unconstitutional, as impairing the obligation of the contract entered into between the state and the tax-payers, and that in the latter the constitutional provision of the state of Louisiana was unconstitutional, as impairing the obligation of the contract entered into between the state and the bondholders, would bring those cases within the exception to the general rule mentioned by Mr. Justice GRAY,—cases in which the officers were proceeding under an unconstitutional law.

It it is thought that a careful study of the cases cited will lead to the conclusion that the immunity from suit enjoyed by every state will protect its officers from suit in their *official capacity*, and performance of official duty, except perhaps in those cases where their performance of the acts complained of, or their refusal to perform certain acts, would constitute an infringement or violation of some right guarantied to the complaining party by the constitution; or, in other words, wherever the property sought to be reached in the hands of the officer is in reality the *lawful* property of the state, or the act, the doing of which is sought to be compelled, is prohibited by a valid (constitutional) law of the state, or the act sought to be enjoined is directed and commanded by a valid (constitutional) law of the state, the officer will be protected from the process of the courts to the same extent as the state itself would be protected.                    ROBERTSON HOWARD.

*St. Paul, Minn., August* 6, 1883.

1 9 Wheat. 738.
2 16 Wall. 203.
3 92 U. S. 531.
4 State v. Jumel, 2 Sup. Ct. Rep. 240.

5 2 Sup. Ct. Rep. 91.
6 State v. Jumel, 2 Sup. Ct. Rep. 128; Elliott v. Wiltz, Id.